# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRY L. MENACKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0762-JTL |
| | ) | |
| OVERTURE, L.L.C., DAGS, INC., and | ) | |
| ZENOR CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 20, 2020
Date Decided: August 4, 2020

Richard L. Abbott, ABBOTT LAW FIRM, Wilmington, Delaware; *Counsel for Plaintiff*.

Michael A. Weidinger, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Greenville, Delaware; *Counsel for Defendants*.

**LASTER, V.C.**

For nearly twenty-five years, Terry L. Menacker, John Fawthorp, and John Iwanicki sold high-end home theater systems through Overture L.L.C. (the "Company"). Each was a member of the Company, with Fawthorp and Iwanicki holding their member interests through entities. Fawthorp and Iwanicki provided the initial start-up capital and then remained behind the scenes. Menacker worked full time in the business, serving as Chief Executive Manager and overseeing the Company's day-to-day operations.

In November 2017, Fawthorp and Iwanicki terminated Menacker. One month later, Menacker signed a document memorializing his withdrawal from the Company. After Menacker withdrew, Fawthorp and Iwanicki exercised their right to buy his interest.

Menacker expected to receive a payment of approximately $893,000. Fawthorp and Iwanicki obtained a valuation from an independent appraiser, who said that Menacker was not entitled to any buyout payment. According to Fawthorp and Iwanicki, Menacker owed the Company $105,977, plus interest.

Menacker filed this action to recover (i) the buyout payment and (ii) other amounts that he now contends that he should have received as compensation during his twenty-five years with the Company. He also contends that Fawthorp and Iwanicki breached their fiduciary duties by causing the Company to pay excessive amounts for services that they provided to the Company.

The defendants moved to dismiss the complaint. This decision grants their motion. The dispute over the buyout payment is subject to arbitration and dismissed on that basis. Menacker's claims for other monetary amounts fail to state claims on which relief can be granted. His claim for breach of fiduciary duty fails for lack of standing.

# I.    FACTUAL BACKGROUND

The facts are drawn from the amended complaint and the documents it incorporates by reference. At this stage of the proceeding, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

## A.    The Company

The Company is a manager-managed, Delaware limited liability company that owns and operates two stores that sell home theater equipment. One is located in Rehoboth Beach; the other is located in Wilmington. *See* Agr. § 6.1; Compl. ¶ 2. The Company's internal affairs are governed by an operating agreement dated August 19, 1993. Dkt. 10 (the "Operating Agreement" or "Agr.").

From its formation in August 1993 until the events giving rise to this litigation, the Company had three members: Menacker, Fawthorp, and Iwanicki. Fawthorp held his member interest through defendant Zenor Corporation, and Iwanicki held his member interest through defendant Dags, Inc. Agr. § 5.1; Compl. ¶¶ 1, 3, 4. For simplicity, this decision refers to the humans who control Zenor and Dags and who took the actions described in this decision, recognizing that their entities were the formal members of the Company and that Fawthorp and Iwanicki acted through those entities.

The Operating Agreement called for the Company to establish and maintain a capital account for each member. Agr. § 7.4. Each member's capital account reflected (i) the cash contributed by or distributed to the member, (ii) the fair market value of any property contributed by or distributed to the member, (iii) the member's share of net profits

2

and net losses, and (iv) any separately allocated items of income, gain, deduction, or loss. Agr. § 7.4.

The Operating Agreement called for apportioning the Company's net profits to the members' capital accounts using one formula and apportioning the Company's net losses to the members' capital accounts using a different formula. The Company's net profits were apportioned according to the members' "Profit Sharing Ratios," defined as 35% for Fawthorp, 35% for Iwanicki, and 30% for Menacker. *See* Agr. § 8.1, Ex. A. The Company's net losses were apportioned according to the members' "Capital Account Percentages," defined as the fraction (expressed as a percentage) in which the numerator was the total of each member's capital account, and the denominator was the total of the all of the members' capital accounts. *See* Agr. §§ 1.1.7, 8.2.

Fawthorp and Iwanicki each made an initial capital contribution of $30,000. *See* Agr. § 7.1, Ex. A. Menacker did not make an initial capital contribution. *See id.* As a result, for the first year of the Company's operations, Fawthorp and Iwanicki each had a Capital Account Percentage of 50%, meaning that if the Company suffered a net loss during that year, then they would share it equally. *See* Agr. § 8.2, Ex. A. Once the Company generated net profits, then those amounts would be added to each member's capital account and change the respective Capital Account Percentages. Once Menacker's capital account had a positive balance, then if the Company suffered a net loss, he would bear his proportionate share based on the Capital Account Percentages in effect at the time.

Neither Fawthorp nor Iwanicki worked in the business. Compl. ¶ 15. Menacker served as Chief Executive Manager. Agr. §§ 6.1, 8.1, Ex. B. In that role, Menacker

3

supervised all of the Company's employees and was required to work at least forty-eight hours per week. Compl. ¶ 10.

Recognizing that Menacker was working for the business full time, Section 8.1 of the Operating Agreement made special provision for him to receive a guaranteed minimum salary payment. Titled "Allocation of Net Profits," Section 8.1 stated:

> Net Profits shall be apportioned among the Members in proportion to their Profit Sharing Ratios. However, beginning with 1994, Terry L. Menacker is guaranteed a minimum salary payment of $75,000 per calendar year exclusive of all fringe benefits provided to him. The guaranteed minimum salary payment shall be increased at the beginning of 1995, and each subsequent calendar year, in proportion to the increase in the Index which has occurred between the Initial Index (the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers (all Items for the Phila-Wilmington-Trenton, PA-DE-NJ-MD Statistical Area on the basis of 1982-84 = 100 also known as CPI-U)) (the "Index") in effect December 31, 1993 and the Index for the December 31 preceding the calendar year for which the guaranteed minimum payment is calculated. Said guaranteed minimum as adjusted shall apply only if Terry L. Menacker continues in his position as Chief Executive Manager of the Company. If Terry L. Menacker's positon as Chief Executive Manager of the Company is terminated for any reason, he shall be entitled to no guaranteed minimum. However, the guaranteed minimum shall be prorated for the calendar year in which his positon is terminated.

Agr. § 8.1.

Except for Menacker's guaranteed salary payment, the Operating Agreement did not provide for any mandatory payments or distributions to the members. Instead, it contemplated that the members could make discretionary "Interim Distributions" from time to time in proportion to their Profit Sharing Ratios. Agr. § 8.3.

4

**B.      The Company's Treatment Of Menacker's Compensation**

In practice, the Company did not pay Menacker a guaranteed minimum salary that was separate from and in addition to his share of the Company's net profits based on his Profit Sharing Ratio. Had the Company done so, then it would have treated Menacker's guaranteed minimum salary payment as liability of the Company. That liability would have been taken into account when determining whether the Company generated a net profit or a net loss, with the resulting net profit or net loss allocated to the members' capital accounts. As a practical matter, Menacker would have received 100% of his guaranteed minimum salary payment while only bearing only his proportionate share of the burden.

Instead, the Company treated Menacker's guaranteed minimum salary payment as an advance against his share of net profits. If Menacker's share of net profits did not exceed his guaranteed minimum salary payment, then he would receive his guaranteed minimum salary payment, but it would be deducted from his capital account. As a practical matter, under that approach, Menacker bore 100% of the burden of his guaranteed salary payment.

**C.      The Parade Of Amendments**

Beginning in 1995, the members amended the Operating Agreement almost every year, and sometimes multiple times per year. There are small inconsistencies in the amendments that suggest they were executed at later times and then backdated. Most notably, the effective dates frequently do not line up with the dates in the signature blocks, or they conflict with the timing of the matters that the amendments ostensibly addressed.

In April 1995, the members executed Amendment No. 1 to the Operating Agreement, giving it an effective date of August 19, 1993. Among other things, the

5

members agreed that for 1994, Menacker's actual guaranteed salary payment was $81,645, rather than the $75,000 contemplated by the original agreement. Agr. Ex. E. They simultaneously executed Amendment No. 2 to the Operating Agreement, also with an effective date of August 19, 1993. In that amendment, they agreed as follows:

> Pursuant to Section 8.1 of the Agreement, profit sharing for 1995 shall be determined by the following formula:
>
> [Fawthorp]: $133,736 . . . plus .35 X (Net Income - $133,736)
>
> Book Income shall be: $133,736 + .35(645,182 - 133,736) = $312,742
> Taxable Income shall be: $133,736 + .35(655,300 - 133,736) = $315,583
>
> [Iwanicki]: .35 X (Net Income - $133,736)
>
> Book Income shall be: .35(645,182 - 133,736) = $179,006
> Taxable Income shall be: .35(653,300 - 133,736) = $181,848
>
> Terry Menacker: .30 X (Net Income - $133,736)
>
> Book Income shall be: .30(645,182 - 133,736) = $153,434
> Taxable Income shall be: .30(653,300 -133,736) = $155,869
>
> Should Book or Taxable Income for 1995 be amended at a future date, the same formula shall apply in determining each Members profit sharing for 1995.
>
> Interest income, dividend income, and the IRC Section 179 depreciation deduction shall be allocated to Members in accordance with their profit sharing ratios.

Agr. Ex. F. Amendment No. 2 thus provided for a profit distribution to Menacker did not make any reference to a guaranteed salary payment for Menacker. The only member receiving a payment in addition to his share of net profits was Fawthorp, who was allocated an additional $133,736.

6

In April 1997, the members entered into Amendment No. 3 to the Operating Agreement, giving it an effective date of August 19, 1993. Amendment No. 3 contained similar calculations for "profit sharing for 1996." Agr. Ex. G. It did not make any reference to a guaranteed salary payment for Menacker.

In April 1998, the members entered into Amendment No. 6 to the Operating Agreement, giving it an effective date of January 1, 1997. It contained similar calculations for "profit sharing for 1997." Agr. Ex. J. It did not make any reference to a guaranteed salary payment for Menacker.

In April 1999, the members entered into Amendment No. 7 to the Operating Agreement, giving it an effective date of January 1, 1998. It contained similar calculations for "profit sharing for 1998." Agr. Ex. K. It did not make any reference to a guaranteed salary payment for Menacker.

In April 2000, the members entered into Amendment No. 8 to the Operating Agreement, giving it an effective date of January 1, 1999. It contained similar calculations for "profit sharing for 1999." Agr. Ex. L. It did not make any reference to a guaranteed salary payment for Menacker.

In July 2000, the members entered into Amendment No. 9 to the Operating Agreement, giving it an effective date of January 1, 2000. It contained similar calculations for "profit sharing for 2000." Agr. Ex. M. It did not make any reference to a guaranteed salary payment for Menacker.

In March 2001, the members entered into Amendment No. 10 to the Operating Agreement, giving it an effective date of January 1, 2001. It contained similar calculations

7

for "profit sharing for 2001." Agr. Ex. N. It did not make any reference to a guaranteed salary payment for Menacker.

In September 2001, the members entered into Amendment No. 11 to the Operating Agreement, titled "AVAILABILITY OF FUNDS FOR CAPITAL ACCOUNT DISTRIBUTION FOR TERRY MENACKER." It provided,

> Pursuant to Section 8.3 of the Agreement, availability of funds for interim distributions to Terry Menacker (Member) shall be determined by the following formula:
>
> Member's Capital Account balance as of the last day of the previous month as determined by book or taxable income, whichever is more.
>
> Less (as of date of requested distribution):
>
> [A list of ten deductions relating to the liabilities and anticipated cash needs of the Company]
>
> Equals: Maximum amount of capital distribution available to Member.

Agr. Ex. O. Amendment No. 11 provided that if Menacker's capital account balance was negative, then the Company could charge Menacker interest on the negative balance. *Id.* Amendment No. 11 did not address Menacker's guaranteed salary payment. It notably referenced Section 8.3 of the Operating Agreement, which provided for interim distributions to members, but it did not reference Section 8.1 of the Operating Agreement, which described Menacker's guaranteed salary payment.

In November 2001, the members entered into Amendment No. 12 to the Operating Agreement, giving it an effective date of January 1, 2002. It contained the calculations for "profit sharing for 2002." Agr. Ex. P. It did not make any reference to a guaranteed salary payment for Menacker.

8

In March 2002, the members entered into Amendment No. 13 to the Operating Agreement, giving it an effective date of January 1, 2002. It fixed some typographical errors in the formula in Amendment No. 11, which governed the amount available for interim distributions to Menacker. Amendment No. 13 did not make any reference to a guaranteed salary payment for Menacker.

In July 2002, the members entered into Amendment No. 14 to the Operating Agreement, giving it a forward-looking effective date of January 1, 2003. It contained the calculations for "profit sharing for 2003." Agr. Ex. R. It did not make any reference to a guaranteed salary payment for Menacker.

Also in July 2002, the members entered into Amendment No. 15 to the Operating Agreement, although this time with an effective date of July 1, 2002. It modified the profit sharing formula to reflect Fawthorp's agreement to repay $1 million on a loan of $1.5 million that the Company had outstanding with Sun National Bank. Agr. Ex. S. The members agreed that in consideration for making the repayment, Fawthorp would receive an additional profit sharing allocation equal to the interest that otherwise would have been due to the bank on the $1 million. If the Company was sold or dissolved, then Fawthorp would receive his $1 million as a preferential payment before any distributions to other members. Amendment No. 15 did not make any reference to a guaranteed salary payment for Menacker.

In September 2003, the members entered into Amendment No. 16, which had an effective date of January 1, 2004. It documented the calculations for "profit sharing for 2004, 2005, & 2006." Agr. Ex. T. Amendment No. 16 did not make any reference to a

9

guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

In April 2004, the members entered into Amendment No. 17, which was made effective as of January 1, 2003. It documented the calculations for "profit sharing for 2003." Agr. Ex. U. Amendment No. 17 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

In April 2005, the members entered into Amendment No. 18, which was made effective as of January 1, 2004. It documented the calculations for "profit sharing for 2004." Agr. Ex. V. Amendment No. 18 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

In April 2006, the members entered into Amendment No. 19, which was made effective as of January 1, 2005. It documented the calculations "for profit sharing for 2005." Agr. Ex. W. Amendment No. 19 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

In December 2006, the members entered into Amendment No. 20, which was made effective as of January 1, 2006. It documented the profit sharing calculations for an unidentified year, although presumably 2006. Agr. Ex. X. Amendment No. 20 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

Also in December 2006, the members entered into Amendment No. 21, which also was made effective as of January 1, 2006. It documented that the Company had secured a term from Artisans' Bank, and the members agreed to be liable to repay the loan in

10

accordance with their respective Profit Sharing Ratios. Agr. Ex. Y. The members simultaneously entered into Amendment No. 22, which documented the same arrangement for a line of credit from Artisans' Bank. *See* Agr. Ex. Z. In December 2008,[1] the members entered into Amendment No. 25, made effective as of November 1, 2007, which documented the same arrangement for another term loan from Artisans' Bank. *See* Agr. Ex. CC.

In April 2008, the members entered into Amendment No. 23, which was made effective as of January 1, 2007. It documented the profit sharing calculations for an unidentified year, although presumably 2007. *See* Agr. Ex. AA. Amendment No. 23 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

In February 2009, the members entered into Amendment No. 24, which was made effective as of November 1, 2006. It amended the formula for the "AVAILABILITY OF FUNDS FOR CAPITAL ACCOUNT DISTRIBUTION FOR TERRY MENACKER" to account for repayments of principal on the Company's debt. *See* Agr. Ex. BB.

---

[1] The date next to Fawthorp's signature on Amendment No. 25 reads "12/6/08." Iwanicki did not sign Amendment No. 25. The date next to Menacker's signature on Amendment No. 25 reads "2/12/0 [sic]." Amending the Operating Agreement required written consent by a majority of the Members. Agr. § 5.2.1. Amendment No. 25 thus became effective when Menacker signed it. It is not clear whether that happened on December 12, 2008, or perhaps on February 2, 2009. For purposes of this decision, the difference is immaterial.

11

In March 2009, the members entered into Amendment No. 26, which was made effective as of January 1, 2008. It documented the profit sharing calculations for an unidentified year, although presumably 2008. *See* Agr. Ex. DD. Amendment No. 26 did not make any reference to a guaranteed salary payment for Menacker or to an additional profit sharing allocation for Fawthorp's loan.

## D. The Net Profits Amendment

In March 2009, the parties executed an amendment that is critical to the case. Amendment No. 27 was made effective as of August 19, 1993, and titled "CLARIFACATION [sic] OF ARTICLE 8.1: ALLOCATION OF NET PROFITS." It stated,

> This Amendment is to clarify Article 8.1 of the Agreement.
>
> When the Agreement was originally drawn up, [the members] anticipated that T. Menacker would be the Chief Executive Manager handling day to day management of the Company, and as such would need to have a minimum distribution from his Capital Account each year. This distribution is referred to in Article 8.1 as a "guaranteed minimum salary payment."
>
> In 1994, the Company did not apportion Net Profit to T. Menacker's Capital Account, but gave him a salary payment directly as stipulated in Amendment No. 1. Starting in 1995, the Net Profit the Company earned yearly was apportioned [to] T. Menacker's Capital Account and his guaranteed minimum salary payment was distributed from this account. Also starting in 1995, the apportionment of Net Profits was determined yearly by Amendments.

Agr. Ex. EE (the "Net Profits Amendment") (formatting added).

Through the Net Profits Amendment, the members agreed on the manner in which the Company had compensated Menacker from 1994 until 2009. The members agreed that the Company had not paid Menacker a guaranteed minimum salary *in addition to* his share

12

of net profits. Rather, the Company had treated these amounts as an advance *against* Menacker's share of net profits. If Menacker's capital account was insufficient to support his guaranteed salary payment, then he would still receive it, but the payment would result in a negative capital account balance that the Company would treat as an interest-bearing loan under the terms of Amendment No. 11.

In November 2009, the members entered into Amendment No. 28, which was made effective as of January 1, 2009. It documented the profit sharing calculations for an unidentified year, although presumably 2009. *See* Agr. Ex. FF. Amendment No. 28 did not make any reference to a guaranteed salary payment for Menacker, which had been addressed by the Net Profits Amendment. It also did not refer to an additional profit sharing allocation for Fawthorp's loan.

In June 2010, the members entered into Amendment No. 29, which also was made effective as of January 1, 2009. It addressed the possibility that Fawthorp would advance a loan to the Company and provided that Fawthorp "shall receive an additional profit allocation equal to interest on the principle [sic] amount of any loan." Agr. Ex. GG. It also gave priority to the repayment of the loan in the event of any sale or dissolution of the Company.

### E.     The Buy-Sell Amendment

Effective January 1, 2010, the members entered into a second amendment that is critical to the case. In Amendment No 30 to the Operating Agreement (the "Buy-Sell Amendment"), the members sought "to provide for continuity in the voting control and ownership of the Company," "to impose certain restrictions and obligations on themselves

and on the Membership Interests now or hereafter owned by the Members," and "to provide for an arrangement governing certain dispositions of their Membership Interests." Agr. Amend. 30 at 1. By its terms, the Buy-Sell Amendment "supersede[d] any provisions of the Operating Agreement" that conflicted with the Buy-Sell Amendment. *Id.*; *see id.* § 23.

The Buy-Sell Amendment governed the transfer of "[a]ll Membership Interests now owned or hereafter acquired by the Members . . . ." *Id.* § 1. The Buy-Sell Amendment anticipated a number of scenarios in which the members might transfer their interests in the Company, including lifetime transfers, death, bankruptcy, divorce, and disability. *Id.* §§ 4, 5, 6, 7. The Buy-Sell Amendment established a process for determining the "Sale Price," i.e., "the purchase price for a Member's entire Membership Interest," which it defined to mean the "Fair Value" of "the Member's Membership Interest in the Company as determined by an independent certified business valuation specialist retained by the Company for purposes of valuing the Company . . . ." *Id.* § 3. The members agreed that they would arbitrate any claims or disputes arising out of or relating to the Buy-Sell Amendment, subject to an exception for equitable relief. *Id.* § 10.

## F. The Parade Of Amendments Continues.

In March 2011, the members entered into Amendment No. 31 to the Operating Agreement, which had an effective date of January 1, 2010. It established the profit sharing allocations for an unidentified year, presumably 2010. Agr. Ex. HH. Unlike in prior years, the amendment distinguished between the Rehoboth Beach store and the Wilmington store. Fawthorp and Menacker received a share of profits for both stores. Iwanicki only received a share of profits for the Wilmington store. Iwanicki's share was defined as "$110,000 or

14

(.35 X Net Income for Wilmington Store), whichever is less," indicating that there was a cap on his distributions. *Id.* The record does not contain any explanation for this approach.

In April 2014, the members entered into Amendment No. 32 to the Operating Agreement, which the third amendment that is critical to the case. Effective January 1, 2013, Amendment No. 32 established the profit sharing allocations for an unidentified year, presumably 2013. Agr. Ex. II. Unlike in prior years, it provided for different distribution percentages depending on the level of the Company's Net Income.

- For the first $900,000 from the Wilmington store,

  o   Iwanicki would receive the lesser of $110,000 or 35% of the net income,

  o   Fawthorp would receive 70% of the net income, minus Iwanicki's share, and

  o   Menacker would receive 30% of the net income.

- For the next $100,000 from the Wilmington store,

  o   Fawthorp would receive 60%, and

  o   Menacker would receive 40%.

- For the next $250,000 from the Wilmington store,

  o   Fawthorp would receive 40%, and

  o   Menacker would receive 60%.

- For all amounts over $1,250,000 in net income from the Wilmington store,

  o   Fawthorp would receive 50%, and

  o   Menacker would receive 50%.

*Id.* For the Rehoboth Beach store, Fawthorp and Menacker would split the net income 50/50 until the accumulated profit equaled any accumulated loss, after which Fawthorp would receive 55% of the net income and Menacker would receive 45%. *Id.*

Amendment No. 32 also addressed Menacker's guaranteed salary payment, stating,

In addition to the above, Terry Menacker shall receive the following. He shall be guaranteed a distribution from his capital account of $175,000 in a calendar year. This distribution shall be made as follows: a $5,000 bi-weekly check made out to Terry Menacker, $508 monthly to pay for medical insurance, and the balance shall be paid to the federal and state governments for estimated taxes. To clarify, Terry Menacker shall receive a guaranteed distribution from his capital account and not a guaranteed payment to a partner. This distribution could cause his capital account to have a negative balance for which he would be liable to make up for [sic].

*Id.* This provision confirmed the arrangement set forth in the Net Profits Amendment: Menacker's guaranteed salary payment was a draw against his capital account, not a guaranteed payment in addition to his distributions of net profits. This decision therefore refers to it as the "Confirmatory Amendment."

Effective January 1, 2014, the members entered into Amendment No. 33 to the Operating Agreement, which is the final amendment in the record. It expanded the restrictive covenants that limited the members' ability to operate a competing business.

### G. Menacker's Employment Is Terminated, And He Withdraws As A Member.

In November 2017, Fawthorp and Iwanicki terminated Menacker as Chief Executive Manager of the Company. Menacker alleges that "[s]ubsequent to November of 2017, [he] advised [the Company] that he had not executed any document that was intended to constitute his withdraw[al] as one of the Members" and that "the proper documentation,

16

notice, and approval of any withdraw[al] as one of the Members did not occur." Compl. ¶ 21.

Notwithstanding that allegation, Menacker executed a document dated December 2, 2017, which states, in its entirety, "As of today's date, I hereby withdraw as a Member of Overture L.L.C." Dkt. 12 (the "Withdrawal Agreement"). Fawthorp and Iwanicki also signed the Withdrawal Agreement. Menacker alleges that Fawthorp and Iwanicki "deceived [him] into signing [the Withdrawal Agreement] under false pretenses, alleging that it was necessary for him to get paid." Compl. ¶ 19; *see also id.* ¶ 24 (referring to "the alleged withdrawal of Menacker as a member of" the Company).

## H.     The Dispute Over The Buyout Payment

Once Menacker withdrew from the Company, Fawthorp and Iwanicki had the right to purchase Menacker's interest in exchange for a "Buyout Payment." *See* Agr. § 10.2. Menacker calculated the Buyout Payment using a formula set forth in Exhibit C to the Operating Agreement, titled "BUYOUT OF MEMBER." *Id.*; Compl. ¶¶ 26–28. Exhibit C stated that the formula it contained "shall be used to calculate the cost in U.S. Dollars that the remaining Members would have to pay to buy out a Dissociated Member's entire interest in the Company or to buy out Terry L. Menacker's interest in accordance with Section 10.2 . . . ." Agr. Ex. C. The formula in Exhibit C was "3.5 x (Earnings Before Tax) x (Dissociated Member's Capital Account Percentage or Terry L. Menacker's Profit

Sharing Ratio)." *Id.* According to Menacker's calculations, he was entitled to a Buyout Payment of $892,563.01. *See* Dkt. 16.[2]

Fawthorp and Iwanicki refused to pay that amount. *See* Dkts. 11, 16. They told Menacker, "Exhibit C that you refer to for calculating a buyout amount was superseded by [the Buy-Sell Amendment] and no longer applies . . . ." Dkt. 16. In accordance with the Buy-Sell Amendment, Fawthorp and Iwanicki obtained an independent valuation to determine the "Sale Price" for Menacker's membership interest. *See id.* According to the resulting valuation, Fawthorp and Iwanicki did not owe Menacker anything. Instead, Menacker owed the Company "$105,977 plus interest for his Capital Account loans." *Id.*

## I.     This Litigation

On September 19, 2019, Menacker filed this action. Dkt. 1. Through this litigation, he seeks to recover the Buyout Payment. He also contends that the Company owes him amounts from prior years for guaranteed salary, profit sharing, and distributions (the "Past-Due Amounts"). Menacker argues that the Operating Agreement entitled him to receive the Past-Due Amounts, which he claims were withheld wrongfully over the course of his nearly twenty-five-year tenure with the Company.

On December 12, 2019, Menacker filed the currently operative complaint. *See* Dkt. 26. It asserts four claims:

---

[2] *See* Compl. ¶¶ 26, 28. According to the allegations in the complaint, Menacker "submitted [his] written demand for the Buyout Payment to [the Company]." Compl. ¶ 26. Under the Operating Agreement, it was Fawthorp and Iwanicki, not the Company, who had the right to buy Menacker's interest in the Company. *See* Agr. § 10.2.

- Count I seeks a declaration that Menacker is entitled to the Buyout Payment and the Past-Due Amounts. Compl. ¶¶ 34–36, 38. It requests a mandatory injunction requiring Fawthorp and Iwanicki "to perform the Article 10 calculation for the Buyout Payment and pay over the sum resulting from that calculation to Menacker." *Id.* ¶ 38.

- Count II contends that Fawthorp and Iwanicki breached their fiduciary duties to the Company by "steer[ing] contracts for services to [Fawthorp and Iwanicki ] at rates and prices that far exceed[ed] the market value for what they actually produced and provided to [the Company]." *Id.* ¶ 40; *see id.* ¶¶ 39–41.

- Count III contends that Fawthorp and Iwanicki breached the Operating Agreement "by failing to pay Menacker the Guaranteed Salary, Distributions and/or Profit Sharing which he was entitled to under the terms of the Operating Agreement" and by withholding the Buyout Payment. *Id.* ¶¶ 44-45; *see id.* ¶¶ 42–47.

- Count IV seeks an accounting "to determine the amounts [the Company] improperly paid or failed to properly pay." *Id.* ¶ 49; *see id.* ¶¶ 48–50.

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

The defendants also have moved to dismiss the complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction. Dkt. 27. "The Court of Chancery will grant a motion to dismiss under Rule 12(b)(1) if it appears from the record that the Court does not have

19

jurisdiction over the claim." *AFSCME Locals 1102 & 320 v. City of Wilm.*, 858 A.2d 962, 965 (Del. Ch. 2004).

> Unlike the standards employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant. The burden is on the Plaintiffs to prove jurisdiction exists. Further, the Court need not accept Plaintiffs factual allegations as true and is free to consider facts not alleged in the complaint.

*Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (alteration in original) (internal quotation marks omitted).

This decision does not address the counts of the complaint in the order presented. It does not discuss Count IV at all because that count seeks an accounting, which is an equitable remedy rather than a cause of action. *See, e.g.*, *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at \*11 (Del. Ch. Aug. 26, 2005). Menacker's entitlement to an accounting thus depends on the outcome of Menacker's substantive claims.

This decision first addresses Counts I and III, which contend that the Company, Fawthorp, and Iwanicki breached the Operating Agreement by failing to pay Menacker the Buyout Payment and the Past-Due Amounts. The two counts are largely duplicative. The principal difference is that Count I includes a request for a mandatory injunction.

Rather than addressing the duplicative counts, this decision addresses Menacker's claims by subject. It first addresses Menacker's claim for the Buyout Payment, which is subject to arbitration and dismissed under Rule 12(b)(1). It then addresses Menacker's claims to the Past-Due Amounts, which fail to state claims on which relief can be granted and are dismissed under Rule 12(b)(6). It finally addresses Count II, which asserts a claim

20

for breach of fiduciary duty. Menacker lacks standing to bring this claim because he withdrew as a member, so this count is dismissed under Rule 12(b)(6).[3]

## A. The Claims Under The Operating Agreement

In Counts I and III, Menacker asserts claims under the Operating Agreement. Count I asks this court to declare that Menacker is entitled to the Buyout Payment and the Past-Due Amounts. Count III contends that Fawthorp and Iwanicki breached the Operating Agreement by failing to pay Menacker the Buyout Payment and the Past-Due Amounts. The two claims thus are duplicative. To determine whether Fawthorp and Iwanicki breached the Operating Agreement, this court must declare what the operative provisions mean. This decision first analyzes the claim for the Buyout Payment. It then addresses the claim for the Past-Due Amounts.

---

[3] Viewed charitably, the complaint could be construed to plead a claim for fraudulent inducement because Menacker alleges that the Fawthorp and Iwanicki "deceived Menacker into signing [the Withdrawal Agreement] under false pretenses, alleging that it was necessary for him to get paid." Compl. ¶ 19; *see also id.* ¶ 24 (referring to "the *alleged* withdrawal of Menacker as a member of [the Company]" (emphasis added)). Menacker did not include a claim for fraud in the inducement in his complaint, and he did not argue or brief that theory in response to the motion to dismiss. The omission of a count titled "Fraudulent Inducement" from the complaint, standing alone, would not have been dispositive. *See generally HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *35–41 (Del. Ch. May 19, 2020). Menacker's failure to brief the issue, however, results in waiver. Menacker only referenced these allegations to invoke equitable tolling in response to the defendants' laches arguments. He did not argue that the Withdrawal Agreement should be disregarded because of the defendants' fraud. "Issues not briefed are deemed waived." *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). This decision accordingly does not address whether Fawthorp and Iwanicki fraudulently induced Menacker to execute the Withdrawal Agreement.

21

## 1. Principles Of Contract Interpretation

Menacker's claims to the Buyout Payment and the Past-Due Amounts raise questions of contract interpretation. The Operating Agreement is a contract governed by Delaware law. *See* 6 *Del. C.* § 18-1101(b). When interpreting such a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Id.* (footnote omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

If the language of a contract is ambiguous, the court "cannot choose between two differing reasonable interpretations" when deciding a Rule 12(b)(6) motion to dismiss.

*Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996). "Dismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law." *Id.* (emphasis in original).

### 2. Menacker's Claim To The Buyout Payment

Menacker asserts that he is entitled to a Buyout Payment of $892,563.01, plus interest, under Article 10 of the Operating Agreement. The defendants claim that any amounts that Menacker receives are subject to the Buy-Sell Amendment, under which Menacker would not receive any payment and would owe the Company $105,977, plus interest, for his outstanding capital account loans. Dkt. 16. Ultimately, this issue must be arbitrated, which divests this court of jurisdiction over the claim.

### a. The Provisions Governing The Buyout Payment

Two competing sets of provisions govern whether Menacker is entitled to receive a Buyout Payment of $892,563.01, plus interest: Article 10 of the Operating Agreement and the Buy-Sell Amendment. Menacker contends that Article 10 controls. The defendants contend that the Buy-Sell Amendment controls.

Article 10 of the Operating Agreement addresses the circumstances under which a party ceases to be a member and the consequences of that event. Section 10.1(a) identifies events that result in a person ceasing to be a member, including "the Withdrawal of a Member with the consent of a Majority of the Remaining Members." Section 10.2 states that "[t]he Remaining Members have the right to buy out the Dissociated Member's entire Capital Account Percentage (or Terry Menacker's Profit Sharing Ratio) at an equal percentage, or a percentage that is mutually agreed to between such Members in

23

accordance with the formula set forth in Exhibit C." Exhibit C establishes a formula that "shall be used to calculate the cost in U.S. Dollars that the Remaining Members would have to pay to buy out a Dissociated Member's entire Interest in the Company or to buy out Terry L. Menacker's interest in accordance with Section 10.2 . . . ." Agr. Ex. C.[4]

The Buy-Sell Amendment states that "[a]ll Membership Interests [owned] by the Members shall be . . . transferred under and subject to the terms and provisions of [the Buy-Sell Amendment]." Agr. Amend. No. 30 § 1. It further states that its terms "supersede[] any provisions of the Operating Agreement, including amendments thereto, conflicting with the terms of this [Amendment]." *Id.* at 1; *see also id.* § 23 ("[The Buy-Sell Amendment] expresses the entire and final understanding of the parties and supersedes all prior agreements with reference to the subject matter hereof . . . .").

Section 4 of the Buy-Sell Amendment addresses "Lifetime Transfers." It states,

> In the event a Member desires to sell his Membership Interest during his lifetime, he may sell it all or in part to another Member(s) . . . . [T]he sale price to another Member(s) for a Member's Membership Interest shall be at the Sale Price as determined by Section 3 [of the Buy-Sell Amendment] or less at the option of the Selling Member.

*Id.* § 4(a) (emphasis added). Section 3 provides that "the purchase price for a Member's entire Membership Interest" equals "the Fair Value of the selling Member's Membership

---

[4] The Operating Agreement does not define the term "Dissociated Member." The concept of a dissociated member is a feature of the Revised Uniform Limited Liability Company Act (the "Uniform Act"), in which dissociation plays a significant role. Section 602 of the Uniform Act identifies "Events Causing Dissociation," including the withdrawal of a member. The Delaware Limited Liability Company Act (the "LLC Act") does not use the concept of dissociation.

Interest in the Company" "as determined by an independent certified business valuation specialist retained by the Company . . . ."

> The Buy-Sell Amendment contains the following mandatory arbitration provision:

> Any controversy, claim or dispute arising out of or relating to this [Amendment] or failure or refusal to perform the whole or any part hereof shall be settled by arbitration in New Castle County, Delaware, in accordance with the rules, then obtaining, of the American Arbitration Association. . . .

> Notwithstanding the foregoing provision to the contrary, in matters relating to equitable relief and/or enforcement of an arbitration award hereunder, the parties hereto irrevocably consent to the exclusive jurisdiction of the courts of New Castle County, Delaware . . . in any action or proceeding among the parties hereto.

*Id.* § 10 (formatting added) (the "Arbitration Provision").

### b.      Arbitrability Of The Claim To The Buyout Payment

The defendants argue that because the Buy-Sell Amendment contains the Arbitration Provision, this court lacks jurisdiction to address Menacker's claim to the Buyout Payment. "Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[5] Under the Delaware Uniform Arbitration Act, "[a] written agreement to submit to arbitration any controversy existing at or arising after the effective date of the agreement is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 10 *Del. C.*

---

[5] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007) (citing *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999)); *see also* 1 Thomas H. Oehmke & Joan M. Brovins, *Commercial Arbitration* § 1:11, Westlaw (database updated May 2020) ("Arbitration clauses which send the entire controversy to an arbitral tribunal divest the court of jurisdiction over the merits . . . .").

§ 5701. Unless an arbitration agreement "specifically referenc[es] the Delaware Uniform Arbitration Act . . . and the parties' desire to have it apply to their agreement," *id.* § 5702(a), "any application to the Court of Chancery to . . . obtain an order requiring arbitration . . . shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act . . . and such general principles of law and equity as are not inconsistent with that Act," *id.* § 5702(c). The Arbitration Provision does not reference the Delaware Uniform Arbitration Act, so the Federal Arbitration Act governs.

Under the Federal Arbitration Act, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

"The threshold question regarding the validity of an arbitration agreement is known as substantive arbitrability." *DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 391 (Del. 2000). "The question of [substantive arbitrability] is generally one for the courts to decide and not for the arbitrators." *Id.* at 392. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns up what the parties agreed about that matter." *Id.* (quoting *First Options*, 514 U.S. at 943). The court must ask,

26

"Did the parties agree to submit the arbitrability question itself to arbitration?" *First Options*, 514 U.S. at 943. "[C]ourts should not presume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable evidence that they did so.'" *DMS Properties-First*, 748 A.2d at 392 (quoting *First Options*, 514 U.S. at 944). If they did not, then the "question of substantive arbitrability is decided by the Court of Chancery as a matter of contract law . . . ." *Id.* at 391.

If an arbitration provision references the rules of an arbitral association that contemplate having an arbitrator determine substantive arbitrability, then the reference is sufficient evidence of a "a clear and unmistakable intent to submit arbitrability issues to an arbitrator." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006). In *Willie Gary*, the Delaware Supreme Court addressed an arbitration provision in an LLC agreement that was identical to the Arbitration Provision in all relevant respects. There, as here, the provision "beg[an] by requiring arbitration of any controversy arising out of or relating to the LLC Agreement in accordance with the AAA rules. But it continue[d] by expressly authorizing the nonbreaching Members to obtain injunctive relief and specific performance in the courts." *Id.* at 81. The Delaware Supreme Court "adopt[ed] the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator," *id.* at 80, but concluded that "the federal majority rule [did] not apply" because the provision did not "refer all controversies to arbitration," *id.* at 81. The high court reasoned that "something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id.* After concluding that there was "no such clear

27

and unmistakable evidence of intent," the Delaware Supreme Court held that "the trial court properly undertook the determination of substantive arbitrability." *Id.*

Like the provision in *Willie Gary*, the Arbitration Provision requires arbitration of "[a]ny controversy, claim or dispute arising out of or relating to this [Amendment] . . . in accordance with the rules . . . of the American Arbitration Association." Agr. Amend. No. 30 § 10. And like the provision in *Willie Gary*, the Arbitration Provision contains an exception for equitable relief. *See id.* Because the Arbitration Provision does not generally refer all controversies to arbitration, the fact that it incorporates the AAA rules, standing alone, is not enough to establish that the parties intended to submit the question of substantive arbitrability to an arbitrator. Neither the Arbitration Provision nor any other aspect of the Buy-Sell Amendment contains "clear and unmistakable evidence of intent" to submit the question of substantive arbitrability to an arbitrator. Thus, this court must determine the issue.

Menacker contends that because the Buyout Payment is governed by Section 10.2 of the Operating Agreement, his claim to the Buyout Payment does not "aris[e] out of or relat[e] to" the Buy-Sell Amendment and is not subject to arbitration. When the parties entered into the Buy-Sell Amendment, they agreed that "*[a]ll* Membership Interests now owned or hereafter acquired by the Members shall be issued, held and transferred under and subject to the terms and provisions of this [Amendment]." Agr. Amend. No. 30 § 1 (emphasis added). They further agreed that "[e]xcept as otherwise provided herein, the Members shall not sell, transfer, pledge, give, bequeath, assign or otherwise alienate, encumber or dispose of any Membership Interest which may now or hereafter be owned

28

by any of them . . . ." *Id.* The parties also agreed that the Buy-Sell Amendment "supersede[d] all prior agreements with reference to the subject matter hereof . . . ." *Id.* § 23. As a result of these provisions, Menacker's Membership Interest became subject to the Buy-Sell Amendment.

Section 4(a) of the Buy-Sell Amendment states that "any sale in accordance with Section 10.2 of the Operating Agreement shall be at the Sale Price as determined by Section 3 or less at the option of the Selling Member." *Id.* § 4(a). Section 10.2 is the provision under which "[t]he remaining Members have the right to buy out the Dissociated Member's entire Capital Account Percentage (or Terry Menacker's Profit Sharing Ratio) . . . ." Agr. § 10.2. Section 4(a) of the Buy-Sell Amendment thus makes its terms applicable to the purchase of member interests from a withdrawing member under Section 10.2.

The parties' dispute over the Buyout Payment thus is a dispute over the price to be paid for Menacker's Membership Interest under Section 10.2. The intersection between Section 4(a) of the Buyout Amendment and Section 10.2 of the Operating Agreement makes that dispute a "controversy, claim or dispute arising out of or relating to" the Buy-Sell Amendment. It is therefore subject to mandatory arbitration under the Arbitration Provision.

The parties' dispute over the Buyout Payment also is subject to arbitration because the purchase of Menacker's interests by Fawthorp and Iwanicki is a transfer of Menacker's interests. The Buyout Amendment provides that "[a]ll Membership Interests" owned by the members at the time they entered into the Buyout Amendment "shall be . . . transferred

under and subject to the terms and provisions of this [Amendment]." Agr. Amend. 30 § 1. The terms of the transfer therefore are subject to mandatory arbitration.

### c. The Request For A Mandatory Injunction

To escape arbitration, Menacker included in Count I a request for a mandatory injunction requiring Fawthorp and Iwanicki "to perform the Article 10 calculation for the Buyout Payment and pay over the sum resulting from that calculation to Menacker." Compl. ¶ 38. In the abstract, a request for a mandatory injunction is a form of equitable relief and falls within the exception to the Arbitration Provision. But that is not the end of the analysis.

"Equitable jurisdiction must be determined from the face of the complaint as of the time of filing, with all material factual allegations viewed as true." *Int'l Bus. Mach. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991). "In deciding whether or not equitable jurisdiction exists, the Court must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim." *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004). "Chancery jurisdiction is not conferred by the incantation of magic words. . . . If a realistic evaluation leads to the conclusion that an adequate legal remedy is available this court . . . will not accept jurisdiction over the matter."[6]

---

[6] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (Allen, C); *accord Comdisco*, 602 A.2d at 78 ("[A] judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional

At bottom, Menacker's claim to recover the Buyout Payment seeks monetary relief. A mandatory injunction is not available to compel the payment of money. *See Candlewood*, 859 A.2d at 994, 998–99 (Del. 2004) ("[A]lthough on its face the complaint purported to seek an equitable remedy—specific performance of [a] contractual obligation to purchase [an insurance policy]—in reality, [the plaintiffs'] claim was one at law for money damages."). Menacker's request for a mandatory injunction does not change the nature of what fundamentally is a claim for breach of contract and resultant damages into a claim for equitable relief.

The aspects of Counts I and III that relate the Buyout Payment are dismissed for lack of jurisdiction under Court of Chancery Rule 12(b)(1).

### 3. Menacker's Claim For Profit Sharing And Guaranteed Salary

Menacker separately claims that the Company failed to pay his "Guaranteed Salary" and "Profit Sharing." Compl. ¶ 31. According to Menacker, he did not receive these categories of compensation "[d]uring his nearly 25 year tenure as Chief Executive and Member of the Company." *Id.* ¶ 16. His claim is not reasonably conceivable, and as framed, it is barred by laches.

---

equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."); *Cochran v. F.H. Smith Co.*, 174 A. 119, 121 (Del. Ch. 1934) (Wolcott, C.) ("It appears sometimes to be thought that if fraud be present in any situation the *open sesame* has been found upon the pronouncing of which the doors of equity are flung wide apart. That is a misconception." (emphasis in original)).

31

Menacker's claim for "Guaranteed Salary" and "Profit Sharing" depends in the first instance on his "Guaranteed Salary" operating as a distinct form of compensation, separate from "Profit Sharing." His claim also depends on both his "Guaranteed Salary" and his "Profit Sharing" operating as distinct forms of compensation, separate from the distributions that the members received. Neither theory comports with the terms of the Operating Agreement when read as a whole.

The original language of the Operating Agreement was ambiguous as to the distinction between Menacker's guaranteed minimum salary payment and his share of the net profits. The applicable language stated: "Net Profits shall be apportioned among the Members in proportion to their Profit Sharing Ratios. However, beginning with 1994, Terry L. Menacker is guaranteed a minimum salary payment of $75,000 per calendar year exclusive of all fringe benefits provided to him." Agr. § 8.1 (the "Original Provision").

One possible reading of the Original Provision was that it promised Menacker a guaranteed minimum salary *in addition to* his share of net profits. Under this reading, Menacker's salary functioned as a guaranteed payment. *See* 26 U.S.C. § 707(c). His salary was treated as a liability of the Company, just like any other liability. If that liability contributed to a net loss, then the net loss was allocated proportionately across all of the members' capital accounts in accordance with their Capital Account Percentages. If the Company generated a net profit, then the net profit was allocated proportionately across all of the members' capital accounts in proportion to their Profit Sharing Ratios. This decision refers to this interpretation as the "Guaranteed Payment Theory."

32

Another possible reading of the Original Provision was that it promised Menacker a guaranteed minimum salary *as an advance* against his share of net profits. Under this approach, Menacker's salary was not treated as a liability of the Company. Instead, it functioned as a draw against his capital account. Menacker's capital account would fluctuate up and down as the Company allocated net profits or net losses, and his guaranteed salary payments would be debited against the balance in his account. Menacker would still be guaranteed his salary each year, but if his capital account did not have sufficient funds to pay it, then his capital account could become negative. Under this approach, the burden of the guaranteed minimum salary would be allocated exclusively to Menacker. This decision refers to this interpretation as the "Draw Theory."

If the operative language consisted only of the Original Provision, then both interpretations would be reasonable. Indeed, based on (i) the use of the language "guaranteed salary," (ii) Menacker's status as the only individual working full time in the business, and (iii) the fact that Fawthorp and Iwanicki contributed relatively small amounts of start-up capital, the Guaranteed Payment Theory would seem to be the more logical reading of the text. It is undisputed that the Company never paid Menacker a guaranteed minimum salary consistent with the Guaranteed Payment Theory, so absent other reasons to dismiss the complaint, Menacker would have a claim to recover his guaranteed minimum salary.

But the Original Provision is not the only source of governing language. In 2009, the members executed the Net Profits Amendment, in which they agreed that the intent of Section 8.1 of the Operating Agreement was for Menacker "to have a minimum distribution

33

from his Capital Account each year." Agr. Ex. EE. By specifying a minimum distribution, the members agreed that their intent was to adopt the Draw Theory. The Net Profits Amendment further explained that beginning in 1995, the Company had paid Menacker under the Draw Theory. *See id.* Subsequently, in 2014, the members entered into the Confirmatory Amendment, which stated that "Terry Menacker shall receive a guaranteed distribution from his capital account and not a guaranteed payment to a partner." Agr. Ex. II. It thus confirmed that the parties were following the Draw Theory. The Confirmatory Amendment also stated that Menacker's guaranteed distribution "could cause his capital account to have a negative balance for which he would be liable to make up for [sic]." *Id.* This statement is consistent with the Draw Theory and inconsistent with the Guaranteed Payment Theory.

In this litigation, Menacker seeks to recover his guaranteed minimum salary dating back to the start of the Company. When the Original Provision is read in conjunction with the Net Profits Amendment and the Confirmatory Amendment, it is not reasonably conceivable that the parties intended for Menacker to receive a guaranteed minimum salary consistent with the Guaranteed Payment Theory. It is clear as a matter of plain meaning that the parties intended for Menacker to be paid under the Draw Theory. Menacker's claim for his guaranteed minimum salary thus fails to state a claim on which relief can be granted.

Menacker responds that the Net Profits Amendment only described how he had been paid in the past. Dkt. 37 at 21. According to Menacker, his right to a guaranteed payment under the Original Provision continued. He views the Net Profits Amendment as a concession by the Company that it breached the Operating Agreement.

34

Assuming for purposes of argument that Menacker had advanced a reasonable interpretation of the Net Profits Amendment, Menacker's claim for his guaranteed salary payment would be barred by laches. "Laches is an equitable defense born from the longstanding maxim 'equity aids the vigilant, not those who slumber on their rights.'" *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009) (quoting 2 Pomeroy's Equity Jurisprudence §§ 418, 419 (5th ed. 1941)). Although a laches analysis is often fact-intensive, the doctrine can be applied at the pleadings stage if "the complaint itself alleges facts that show that the complaint is filed too late." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch.1993) (Allen, C.). For claims "arising out of contractual or fiduciary relations," the presumptive limitations period for laches is three years. 10 *Del. C.* § 8106(a); *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

Even under Menacker's reading, the Net Profits Amendment clearly put Menacker on notice that the Company was following the Draw Theory and not the Guaranteed Payment Theory. In 2014, the Confirmatory Amendment demonstrated this fact and made clear that, going forward, the Company would continue to follow the Draw Theory. Menacker was obligated to file suit within a reasonable time after 2014 if he wanted to pursue a claim under the Guaranteed Payment Theory. He did not file this action until 2019, more than five years after he was clearly put on notice of the Company's position and ten years after he was informed about how the Company had paid him and (at a minimum) put on inquiry notice about how the Company would be paying him going forward. Menacker has not offered any sound justification for this delay.

Menacker also argues that he never received "Profit Sharing," but that claim is not reasonably conceivable. The Operating Agreement did not provide for "Profit Sharing" as a distinct form of compensation. The Operating Agreement called for the Company's net profits to be allocated to the members' capital accounts based on the Profit Sharing Ratios. In their discretion, the members could determine that the Company had available cash and make interim distributions in proportion to their Profit Sharing Ratios. The Net Profits Amendment and the Confirmatory Amendment demonstrate that this is what the members did, as does the parade of quasi-annual amendments to the Operating Agreement, in which the members agreed on the amounts that they each would receive for purposes of profit sharing.

With a little math, one can readily determine from the quasi-annual profit sharing amendments that Menacker received a share of profits in excess of his guaranteed minimum salary. In 1995, for example, the members executed Amendment No. 2, which governed profit sharing for 1995. The amendment set forth three formulas that were used to determine profit sharing for 1995, one for each member, and listed each member's book income and taxable income. Agr. Ex. F. In 1995, Menacker's taxable income was $155,869. *Id.* In 1996, Menacker's taxable income was $204,342. Agr. Ex. G.

Under the Operating Agreement, Menacker was entitled to a guaranteed salary payment that was adjusted upward annually to reflect the change in the Consumer Price Index, i.e., to account for inflation. Agr. § 8.1. Between 1995 and 1996, Menacker's taxable income increased by $48,473, or 31.1%. The court can take judicial notice of the fact that

36

between 1995 and 1996, the general Consumer Price Index increased by 3.32%.[7]

Accordingly, part of the $155,869 of taxable income attributed to Menacker in the 1995 profit sharing exhibit must have been for income other than his guaranteed minimum salary. The only possibility is profit sharing.

Menacker cannot now contend that he did not receive the amounts set forth in the quasi-annual profit-sharing amendments. Menacker signed each amendment, and by doing so, he acknowledged that he was being compensated in the manner described in those amendments.

The allegations of the complaint do not support a reasonable inference that Menacker did not receive his share of profits. The only reasonable inference is that he received guaranteed salary payments that took the form of an advance against his eventual share of net profits, and he received distributions as reflected in the quasi-annual profit-sharing amendments. The aspects of Counts I and III that relate to guaranteed salary payments and profit sharing are dismissed under Rule 12(b)(6).

---

[7] "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." D.R.E. 201(b)(2). In December 1995, $100 had the same buying power as $103.32 in December 1996. *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm. The Operating Agreement specified a regional Consumer Price Index, but it is not reasonably conceivable that the regional index increased at a rate that was an order of magnitude greater than the national index.

#### 4. Menacker's Claim For Distributions

Menacker separately seeks to recover damages for distributions. Compl. ¶¶ 14–16. The Operating Agreement contemplates "Interim Distributions." The relevant language states,

> From time to time, the Members shall determine in their reasonable judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs . . . . To the extent such excess exists, the Company may make Distributions to the Members. To the extent such Distributions are from accumulated Net Profits, such Distributions shall be in accordance with [the members'] Profit Sharing Ratios. Distributions may be in cash or property (which need not be distributed proportionately) or partly in both, as determined by the Company.

Agr. § 8.3 (the "Distributions Provision"). The next section sets forth various limitations on distributions by the Company, none of which are relevant to this case. *See* Agr. § 8.4

The language of the Distributions Provision is plain. None of the members, including Menacker, were contractually entitled to receive distributions. The Company was authorized to make distributions to its members, but only if the members determined to make a distribution. *See* Agr. § 8.3. The phrase "may make distributions" establishes that distributions were discretionary.[8]

---

[8] *See May,* BLACK'S LAW DICTIONARY (11th ed. 2009) ("1. To be permitted to [e.g.,] <the plaintiff may close>"); *see also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 658 (1965) (describing the word "may" as "permissive" when interpreting a contract); *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldg. Co.*, 853 A.2d 124, 127 n.5 (Del. Ch. 2004) (explaining that 6 *Del. C.* § 18-108, which stated that "a limited liability company *may*, and shall have the power to, indemnify and hold harmless any member or manager," is permissive and does not create a per se right to indemnification); *Affrunti v. Zwirn*, 892 F. Supp. 451, 459–60 (E.D.N.Y. 1995) (explaining that a statute providing that members of town zoning board "may" be compensated did not create a right to

Menacker thus does not have any claim for Past-Due Amounts based on distributions. Regardless, it is clear from the structure of the Operating Agreement and the allegations of the complaint that when the members agreed on amounts for profit sharing, *they were making distributions*. The Operating Agreement set up a mechanism under which net profits were allocated to each member's capital account in proportion to the members' Profit Sharing Ratios, and net losses were allocated to each member's capital account in proportion to the members' Capital Account Percentages. Available cash does not magically teleport from a capital account into a member's pocket. It requires a distribution. When the members received their shares of profits, they were receiving distributions, and when Menacker received his guaranteed minimum salary payment, he was receiving an advance against an eventual distribution of profits.

Menacker has not stated a claim to recover distributions. The Operating Agreement did not give him a right to mandatory distributions, and based on the allegations of the complaint, it is not reasonably conceivable that he did not receive the distributions to which he was entitled.

---

compensation), *aff'd*, 100 F.3d 943 (2d Cir. 1996); *Reynolds v. City & Cty. of S.F.*, 53 Cal. App. 3d 99, 103 (1976) (explaining that statute providing that money other than taxes "may" be returned was permissive and did not create right of recovery); *State ex rel. Scherer v. Madison Cty. Comm'rs*, 527 N.W.2d 615, 620 (Neb. 1995) (explaining that statute providing that county board "may" remove snow from certain streets did not impose duty to do so).

## B. Count II: Breach Of Fiduciary Duty

Count II contends that Fawthorp and Iwanicki breached their fiduciary duties by causing the Company to overpay for services through a series of self-interested transactions. Compl. ¶¶ 16–18, 39–41. This claim is a derivative claim, and Menacker lacks standing to assert it.

Generally speaking, a derivative claim is a cause of action belonging to an entity that another party, typically a stockholder, seeks to litigate on the entity's behalf.[9] "[C]ase law governing [standing for] corporate derivative suits is equally applicable to suits on behalf of an LLC." *CML V, LLC v. Bax*, 6 A.3d 238, 243 (Del. Ch. 2010) (alteration in original) (internal quotation marks omitted), *aff'd*, 28 A.3d 1037 (Del. 2011) as corrected (Sept. 6, 2011).

The test for distinguishing between direct and derivative claims in the LLC context is substantially the same as in the corporate context. *See Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992). The determination turns solely on "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the

---

[9] In limited circumstances, a creditor can assert derivative claims. *See N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims . . . ."). In rarer circumstances, a director can assert derivative claims. *See Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008) (en banc) (indicating that director could sue if necessary "to prevent a complete failure of justice on behalf of the corporation").

stockholders, individually).” *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

Menacker alleges that Fawthorp and Iwanicki “abused their controlling 70% majority interest in [the Company] over 20+ years to steer contracts for services to Fawthorp and Iwanicki, and/or their affiliated entities, at rates and prices that far exceed[ed] the market value for what they actually produced and provided to [the Company].” Compl. ¶ 40. According to Menacker, “over the past 20+ years, [the Company] has utilized the accounting and bookkeeping services of Fawthorp and paid amounts to him that exceed the reasonable, fair market value of such services.” *Id.* ¶ 17. Menacker also alleges that “over the past 20+ years[,] Iwanicki has provided website services to [the Company] at rates and costs that far exceed the reasonable, fair market value of such services.” *Id.* ¶ 18.

If true, these allegations would establish a harm suffered by the Company, rather than Menacker in his individual capacity. If Fawthorp and Iwanicki indeed caused the Company to overpay for services, then it was the Company, rather than Menacker, that suffered a financial loss from the overpayment. The allegations in the complaint thus establish a basis for a derivative claim rather than a direct claim.

Menacker argues that Fawthorp and Iwanicki’s breaches of fiduciary duty “caused [him] to suffer damages in the form of lost Distributions and/or Profit Sharing.” *Id.* ¶ 41. Although that could be true, Menacker’s injury is not separate and distinct from the injury suffered by the other members, because each member suffered injury in proportion to their

41

Profit Sharing Ratios (in years when the Company had a net profit) or in proportion to their Capital Account Percentages (in years when the Company had a net loss).

The right to bring a derivative claim on behalf of a Delaware LLC is governed by Section 18-1001 of the Delaware Limited Liability Company Act, which states,

> A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or Members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

6 *Del. C.* § 18-1001. Under the LLC Act, the plaintiff in a derivative action must be "a member or an assignee of a limited liability company interest at the time of bringing the action . . . ." *Id.* § 18-1002. A plaintiff who cannot meet this requirement lacks standing to sue.

On December 2, 2017, Menacker withdrew as a member of the Company. He did not file this action until September 19, 2019, almost two years after his withdrawal. *See* When Menacker filed this action, he no longer was a member and thus did not have standing to assert a derivative claim on its behalf. Accordingly, the defendants' motion to dismiss Count II of the complaint is granted.

## III.    CONCLUSION

The aspects of Counts I and III that relate to the Buyout Payment are dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1). The remainder of the complaint is dismissed under Rule 12(b)(6) for failing to state a claim on which relief can be granted.